244 N.J. Super. 77 (1990)
581 A.2d 878
RICHARD VALENTI, LEO SHEARN AND JOHN ARMSTRONG, AS TAXPAYERS OF THE CITY OF ABSECON, INDIVIDUALLY AND AS REPRESENTATIVES OF AN UNINCORPORATED ASSOCIATION KNOWN AS CONCERNED FOR ABSECON, PLAINTIFFS-RESPONDENTS/CROSS-APPELLANTS,
v.
THE PLANNING BOARD OF THE CITY OF ABSECON, DEFENDANT/CROSS-RESPONDENT, AND SHOPPING CENTER PROPERTIES, INC., DEFENDANT-APPELLANT/CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1990.
Decided October 17, 1990.
*78 Before Judges PRESSLER, BAIME and DiMARTINO.
Christine M. Cote argued the cause for defendant-appellant/cross-respondent Shopping Center Properties, Inc. (Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, attorneys, Emanuel L. Levin, of counsel; C.M. Cote on the brief).
Michael J. Fitzgerald argued the cause for defendant/cross-respondent The Planning Board of the City of Absecon (Todd, Gemmel, Nugent & Fitzgerald, attorneys, M.J. Fitzgerald on the brief).
Mark H. Sandson argued the cause for plaintiffs-appellants/cross-respondents (Hankin, Sandson, Sandman & Cowhey, attorneys, M.H. Sandson on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
*79 This is an action in lieu of prerogative writs arising out of the grant of dimensional variances by defendant Absecon Planning Board ("board") pursuant to N.J.S.A. 40:55D-70(c)(2). The variance permitted defendant Shopping Center Properties, Inc. ("applicant") to deviate from various of the applicable bulk limitations of the zoning ordinance in the development of its property for a shopping center. Plaintiffs, neighborhood objectors, brought this action challenging the board's decision on both substantive and procedural grounds. Defendant applicant appeals from the ensuing judgment of the Law Division, which reversed the Planning Board's grant based on the trial judge's conclusion that the board had exceeded the scope of its statutory discretion in granting the variances. Plaintiffs cross appeal from the trial court's rejection of their procedural and technical challenges. We concur with the trial judge's conclusion that the board's proceedings in the respects challenged were sufficiently regular. We conclude, however, that the Planning Board's application of N.J.S.A. 40:55D-70(c)(2) constituted an appropriate exercise of discretion entitled to judicial deference. We therefore reverse the order setting aside its grant of relief to the applicant.
The premises in question, a tract of 16.05 acres, fronts on U.S. Highway 30, also known as the White Horse Pike, and is located in the Design Commercial District of Absecon. As stated by the Absecon zoning ordinance:
The purpose of the Design Commercial District is to encourage major commercial concentration with easy highway access with sufficient controls and within an overall design motif.
Permitted uses, on minimum lots of six acres, include retail stores, restaurants, banks, theaters and professional and business offices. The applicant proposes to develop its tract as a shopping center containing one large anchor store and a number of smaller retail units. It filed its initial application for site plan approval and variance relief pursuant to N.J.S.A. 40:55D-70(c)(2) in October 1988. Its consultants thereafter participated *80 in four work sessions with the board and its professional consultants, as a result of which various modifications in the original plans were made to meet board suggestions and recommendations. Public hearings were held in February and March, 1989, resulting in the resolution which is the subject of this action.
The proposed development is in large measure consistent with the ordinance's dimensional requirements, including lot coverage.[1] The applicant required, however, five bulk variances, four which were of de minimus nature. First, the height limitation for buildings is 35 feet. The only proposed deviation from this limitation is the 38-foot height resulting from the planned construction of several cupolas, added to the plan for reasons of aesthetics and architectural consistency. Second, the free-standing highway signs, while conforming to area limitations, are proposed to be 30 feet high rather than the 25 foot limitation, an excess found by the board to render the signs more legible and visible in view of the scope and nature of the development. Third, the building access limitation requires 20 feet of open space in front of the building and 12 feet at the rear and sides. These areas are permitted to include pedestrian walkways and landscaping. Although one facade of the proposed anchor store complies, the others do not strictly comply. The board nevertheless concluded, based on the planter and landscaped areas proposed, that "while the strict provisions of this section have not been met, the intent to provide an open area adjacent to the buildings has been met while maintaining the overall design requirements of the site." Fourth, instead of *81 the required 650 parking spaces required for retail use, the plan proposes 605. The board concluded that:
The ordinance requirements for the number of parking spaces does not take into consideration the reduction in the number of spaces required where a commercial project increases in size and both generally accepted industry and professional standards support a need for less than the 605 spaces provided.[2]
The fifth variance sought was from the building length requirements of the ordinance. The deviation requested and granted was substantial, and it was this deviation which underlay the trial court's reversal. In sum, the ordinance limits building length to 100 feet or eight units in a row, with no more than two contiguous units without variation in setback. The anchor store of the proposed development has a projected rear facade of 367 feet. As to the other structures, the eight-unit requirement has been met, but contiguous units vary up to five rather than two. Since the units are, however, all 25-foot wide modules, consolidation of use might result in reducing or eliminating that deviation. Finally, the retail store facades vary from 125 to 150 feet in the same plane. In allowing these deviations, the board found that:
In addition to the required 20-foot wide buffer and the addition of landscaping to mitigate and offset the building length, the applicant has used color, texture and other architectural and design elements to lessen the effective impact of the building length and to achieve compliance with the intent of the district regulations. In view of the overall design of the project, including the fact that the site significantly exceeds the minimum requirements of the district, and the practical necessities of including an anchor store to make such a major commercial concentration economically viable, the required building length variance is justified.
The board had also offset any undue intensity resulting from the building length variances by requiring the applicant to decrease lot coverage from 67.4% to 65% in order to provide more open space. See note 1 supra.
In challenging the board's resolution in the Law Division, plaintiffs successfully relied on the scope of the building-length *82 variances in support of their claim that the board had overstepped its c(2) authority. They also argued that procedural defects and deficiencies tainted the board's action. These asserted deficiencies included the failure of the board to require its own professional consultants to testify under oath and the claims that the number and scope of the pre-hearing work sessions were indicative of the board's favorable pre-judgment of the application, that the revised site plan was untimely submitted, that the objectors were accorded an inadequate opportunity to cross-examine, and that the resolution adopted by the board was not a "memorializing" resolution within the intendment of N.J.S.A. 40:55D-70(c). These allegations, which constitute the gravamen of the cross appeal, were all considered and rejected by the trial judge.
We address first the cross appeal. At the outset, we note that while the trial judge orally ruled on each of plaintiffs' claims and gave full and reasoned explanations for deciding each of them in the board's favor, he never entered an order dismissing those allegations of the complaint, apparently because no such order was ever presented to him. We assume this is so because his substantively-based reversal of the board's action rendered the procedural challenges moot. Consequently, however, there was no written order which could properly have served as the subject of plaintiffs' cross appeal.[3] It is well settled that an appeal lies only from a written order or judgment, not from opinions or oral decisions which have not been reduced to order or judgment. See Heffner v. Jacobson, 100 N.J. 550, 553, 498 A.2d 766 (1985); Beck v. Beck, 239 N.J. Super. 183, 189, 570 A.2d 1273 (App.Div. 1990); Chimes v. Oritani Motor Hotel, Inc., 195 N.J. Super. 435, 443, 480 A.2d 218 (App.Div. 1984); Malhame v. Borough of Demarest, 174 *83 N.J. Super. 28, 31, 415 A.2d 358 (App.Div. 1980). Accordingly we have no option but to dismiss the cross appeal. We nevertheless have considered the merits of the issues attempted to be raised, and we are satisfied, substantially for the reasons expressed by the trial judge, that they were correctly decided. R. 2:11-3(e)(1)(E).
We turn now to the primary issue raised by this appeal, namely the board's exercise of discretion in granting the c(2) variances and, in particular, the building length variances. N.J.S.A. 40:55D-70c(2) authorizes a board of adjustment or, as here, a planning board in the exercise of its ancillary jurisdiction to permit deviation from bulk limitations:
where in an application or appeal relating to a specific piece of property the purposes of this act would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment...
In its recent explication of the import and operation of the c(2) variance, the Supreme Court in Kaufman v. Planning Bd. for Warren Tp., 110 N.J. 551, 542 A.2d 457 (1988), made clear that the test to be applied by the local agency in considering a variance application under this section is whether the grant of approval will "actually benefit the community in that it represents a better zoning alternative for the property." Id. at 563, 542 A.2d 457. As the Court further explained:
The focus of a c(2) case, then, will be not on the characteristics of the land that, in light of current zoning requirements, create a "hardship" on the owner warranting a relaxation of standards, but on the characteristics of the land that present an opportunity for improved zoning and planning that will benefit the community. Ibid.

The Court was, furthermore, careful to emphasize that in prescribing a "better zoning alternative" test, it was not according the local board a license to act in abrogation of the intent and plan of the zoning ordinance even though a board, by definition, acts contrary to the letter of the ordinance whenever it grants variance relief. To assist boards in determining whether the grant of specific relief would run afoul of the *84 ordinance or would rather constitute a permissible deviation within its intentional framework, the Court had this to say:
By rooting the c(2) variance in the purposes of the MLUL [N.J.S.A. 40:55D-1, et seq.], the Legislature has confined the discretion of boards: they cannot rewrite ordinances to suit the owner or their own idea of what municipal development regulations should be. Rather, the board should seek ... to effectuate the goals of the community as expressed through its zoning and planning ordinances. Id. at 564.
We are satisfied from our careful review of the record of the board proceedings and its thorough, thoughtful, and pertinent resolution that the board scrupulously applied the principles enunciated by Kaufman. The entire tenor of its resolution was based on its perception that the purpose of the Design Commercial District would be better served by a single integrated 16-acre commercial development than by multiple smaller developments on minimum area lots. It recognized that the larger development lent itself to better municipal control in respect of such desiderata as traffic planning, environmental concerns, protection of neighboring residential communities, and overall superiority of design opportunities. The board also concluded that the bulk limitations prescribed by the ordinance for a six-acre development were not entirely appropriate to a 16-acre development and that the significant consideration was not merely the raw numerical limitations imposed by the ordinance but rather the proportionality of the proposed development both in terms of its own lot area and the surrounding area. The board's resolution made this approach clear in such findings as:
The site significantly exceeds the six acre minimum lot area in the district and this project allows most of the remaining undeveloped property in this district to be developed as a single entity and with single design motif.
And further:
The proposed use is a permitted use in the Design Commercial District and fulfills the intent of the district.... The development of this site, although on a larger scale than existing or approved commercial developments in the vicinity, is not inconsistent in terms of such design elements as lot coverage and building length.
The required variances advance the purposes of zoning since for this particular site they represent a more practical zoning alternative and allow this site to *85 be developed in conformity with the intent of the district which is to encourage major commercial concentrations with easy highway access, sufficient controls and with an overall design motif. This project fulfills that intent. Any detriment from the variances is minimal since the variances generally provide a better design alternative for the site or an equally acceptable alternative to the ordinance provisions. Because of the outstanding design of the project and the significant buffering provided to the closest residentially zoned district, there will be a minimal negative impact from the variances. The benefits of the deviations substantially outweigh any detriment and the variances may be granted without substantial detriment to the public good or substantial impairment to the intent and purpose of the master plan and ordinance.
In sum the board, in our view, acted intelligently, fairly, and with a proper appreciation of the limited nature of its role in granting the variances.
As we understand this record, the basis of the trial judge's contrary conclusion was the extent of the building-length variances. He regarded variances permitting a 367 foot facade in lieu of the maximum permitted length of 100 feet, five contiguous units instead of the maximum permitted two, and unbroken building length of 125 to 150 feet instead of 100 feet as so substantial as to constitute, in effect, a rezoning. We are satisfied, however, that his focus was misplaced. The quantum of the dimensional variances is not itself dispositive. The variances must, rather, be considered in context and in terms of their functional and aesthetic impact on the surrounding area. The board concluded that with a reduced lot coverage, the longer buildings could be accommodated on the larger lot without doing any violence to the zone plan and that the unified development of 16 acres would promote the intent of the zone plan and would confer upon the community the benefit implicit in a single-vision, integrated land use.
The findings of the board were all well founded in the evidence before it and its conclusions, reasonably based thereon, were consistent with its statutory grant of power. Its action was therefore entitled to judicial deference. See Kaufman, supra, 110 N.J. at 558, 542 A.2d 457.
*86 The order appealed from is reversed. The cross appeal is dismissed. We remand to the trial court for entry of an order dismissing the complaint.
NOTES
[1] Lot coverage in the Design Commercial District is somewhat flexible. Although the basic maximum is 60%, the ordinance permits the board, in its discretion, to allow coverage up to 70% if it finds the design to be outstanding. The coverage proposed by the applicant here was 67.4%. The board was satisfied that the proposed development qualified as outstanding design "in both the overall site design and the architectural design" for reasons specifically articulated in its resolution. Nevertheless, it granted the variances and site plan approval conditioned upon the applicant's reduction of coverage to 65%.
[2] The parking variance was nevertheless conditioned upon plan revisions "because there remains a degree of uncertainty as to the particular requirements of this facility."
[3] We note that plaintiffs' notice of cross appeal references a purported order of October 6, 1989. That, however, was the date of trial on which the judge rendered his oral opinion. No written order was then entered and the date in the notice of cross appeal is therefore a practical irrelevancy.